UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :     **SEALED**
                                        **INDICTMENT**

      - v. -                      :

LILIAN JAKACKI,                         15 Cr.
a/k/a "Lilian Wieckowski,"              15 CRIM 727
MARCIN JAKACKI,                   :
a/k/a "Martin,"
MW&W GLOBAL ENTERPRISES, INC.,    :
d/b/a "Chopin Chemists,"
EUROPEAN APOTHECARY, INC.,        :
d/b/a "Chopin Chemists," and
ROBERT CYBULSKI,                  :

                                        USDC SDNY
                                        DOCUMENT
              Defendants.         :     ELECTRONICALLY FILED
                                        DOC #:
                                        DATE FILED: 10/26/15

- - - - - - - - - - - - - - - - - - X

COUNT ONE

(Conspiracy to Distribute Narcotics)

      The Grand Jury charges:

Introduction

      1.    From at least in or about March 2010, up to and

including in or about October 2015, in the Southern District of

New York and elsewhere, LILIAN JAKACKI, a/k/a "Lilian

Wieckowski" ("WIECKOWSKI"), MARCIN JAKACKI, a/k/a "Martin," MW&W

GLOBAL ENTERPRISES, INC., d/b/a "Chopin Chemists" ("MW&W"),

EUROPEAN APOTHECARY, INC., d/b/a "Chopin Chemists" ("EUROPEAN

APOTHECARY"), and ROBERT CYBULSKI, the defendants, and others

known and unknown, conspired to distribute hundreds of thousands

JUDGE RAKOFF

of pills of the Schedule II controlled substance oxycodone, a highly addictive pain medication available by prescription only.

2.    As detailed further below, the scheme was centered at MW&W and EUROPEAN APOTHECARY, pharmacies owned and operated by LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, in Brooklyn and Queens, New York.  Both pharmacies were known as "Chopin Chemists."  There, WIECKOWSKI, a licensed pharmacist, and her husband, MARCIN JAKACKI, a/k/a "Martin," the defendant, conspired to dispense hundreds of thousands of oxycodone pills either without any prescription or on the basis of fraudulent prescriptions.  WIECKOWSKI and JAKACKI distributed these pills to individuals, including ROBERT CYBULSKI, the defendants, among others.

3.    In total, between in or around at least 2010 and in or around October 2015, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants, unlawfully distributed more than 500,000 tablets of oxycodone, for which WIECKOWSKI and JAKACKI collected hundreds of thousands of dollars in cash payments.  Of the more than 500,000 oxycodone tablets that were illegally sold, ROBERT CYBULSKI, the defendant, obtained at least tens of thousands of oxycodone tablets.

## BACKGROUND ON OXYCODONE

4.    Oxycodone is a highly addictive, narcotic-strength opioid, used to treat severe and chronic pain conditions, such as post-operative pain, severe back and orthopedic injuries, as well as pain associated with certain forms of cancer and other terminal illnesses.  Oxycodone can be legitimately obtained from most pharmacies with a prescription written by a treating physician, and is typically dispensed in tablet form, with dosages varying between 5 milligrams and 80 milligrams.

5.    Every year more than 13 million Americans abuse oxycodone, with the misuse of prescription painkillers such as oxycodone leading to as many as 500,000 annual emergency room visits nationwide.  In addition, studies show that misuse of prescription medication, such as oxycodone, can lead to an increased rate of heroin use.  As a result, the distribution of oxycodone is heavily regulated.  For example, prescriptions for oxycodone cannot exceed a 30-day supply, and cannot allow for "refills."  Instead, a patient who has exhausted his or her initial prescription must see a treating physician again each month and be re-evaluated before obtaining a new prescription from the doctor.  Similarly, to curb any potential for abuse, pharmacies are required to track and report all prescriptions filled for oxycodone, and by law, no patient is supposed to be

3

able to fill a prescription for oxycodone more than once every 30 days, even if written by a different doctor.

6.     Oxycodone prescriptions have enormous cash value to drug dealers.  Oxycodone prescriptions can be filled at virtually any pharmacy and the oxycodone tablets can then be resold on the street for thousands of dollars.  For example, 30-milligram oxycodone tablets have a street value of approximately $30 per tablet in New York City, with prices ranging even higher in other parts of the country such as Massachusetts, Vermont, and Maine.  In other words, a single prescription for 90 30-milligram tablets of oxycodone can net the distributor $2,700 in cash or more.

## THE SCHEME TO DISTRIBUTE OXYCODONE

7.     The defendants charged herein collectively worked to distribute illegally more than 500,000 tablets of oxycodone, with a street value in excess of $10 million.

8.     Starting at least in or about March 2010, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, owned and operated MW&W in Brooklyn, New York.  In or about 2011, she opened a second pharmacy in Queens, New York, EUROPEAN APOTHECARY (together with MW&W, the "Pharmacies"), and thereafter owned and operated both.  Both of the Pharmacies were known by name "Chopin Chemists."  In addition to being the owner of the Pharmacies, WIECKOWSKI was also a licensed pharmacist and

4

registered the Pharmacies with the Drug Enforcement
Administration (the "DEA") to be allowed to order and dispense
controlled substances, including oxycodone.  A pharmacy that is
registered with the DEA can order oxycodone from a number of
suppliers from around the country.

9.   For three years in a row, between 2010 and 2012,
MW&W, a small neighborhood establishment, was the leading
purchaser of oxycodone tablets in its zip code, which included
at least two national chain stores.  In 2010, MW&W's oxycodone
purchases exceeded the second-highest purchaser's orders by
approximately 32,200 tablets.  In 2011, MW&W's oxycodone
purchases exceeded the second-highest purchaser's orders by
approximately 247,380 tablets.  In 2012, MW&W's oxycodone
purchases exceeded the second-highest purchaser's orders by
approximately 243,700.

10.   In 2013, the DEA conducted an audit of the
Pharmacies (the "DEA Audit").  The DEA found that at MW&W,
approximately 760,000 tablets of oxycodone were ordered between
on or about January 1, 2011 and on or about June 4, 2013 (the
"Audit Period").  Of that, the DEA found, more than 430,000
tablets of oxycodone had been distributed without any
prescription.

11.   The DEA Audit also found that of the
approximately 760,000 tablets of oxycodone ordered during the

5

Audit Period, more than 320,000 tablets had been dispensed on the basis of a prescription; however, with respect to at least hundreds of these prescriptions, which accounted for tens of thousands of distributed tablets, the prescriptions were falsified.  These fraudulent prescriptions were written on real prescription forms, but were in fact completed by someone other than the physician who purportedly issued the prescription for the oxycodone.  Many of these prescriptions forms were stolen from physicians' offices around New York City, including in Manhattan and the Bronx.

12.   At MW&W, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, distributed and directed others to illegally distribute hundreds of thousands of oxycodone pills to individuals based often on fraudulent prescriptions.  At times, these prescriptions were made out in false names, including the names of famous luxury brands, such as Coach and Chanel.  Other times, WIECKOWSKI sold oxycodone to individuals even though they did not have a prescription.

13.   ROBERT CYBULSKI, the defendant, was one of the largest purchasers of illegal oxycodone from MW&W.  CYBULKSI regularly visited MW&W with multiple prescriptions written in others' names, usually obtaining more than 500 30-milligram oxycodone tablets per occasion.  Other times, CYBULSKI would obtain oxycodone from WIECKOWSKI or those acting at her

6

direction even though CYBULSKI did not have any prescriptions. CYBULSKI visited MW&W multiple times a month.  In total, CYBULSKI illegally obtained tens of thousands of tablets of oxycodone from MW&W.  In return, CYBULSKI paid WIECKOWSKI in cash around $2 per pill, resulting in payments to WIECKOWSKI of tens of thousands of dollars.

14.  MARCIN JAKACKI, a/k/a "Martin," the defendant, participated in the illegal oxycodone distribution by helping to arrange the illegal sales.  In or about September 2015 and in or about October 2015, JAKACKI coordinated the illegal sale of hundreds of tablets of oxycodone to a DEA undercover agent at EUROPEAN APOTHECARY.  In that role, JAKACKI directly discussed the price and quantity of the oxycodone tablets that he and his wife agreed to sell illegally to the undercover agent.  JAKACKI even instructed the undercover agent on how often the undercover agent should purchase oxycodone to avoid scrutiny.

15.  On occasion, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, used blank prescription forms obtained from physicians' offices to illegally dispense oxycodone.  When asked by certain individuals who did not have proper prescriptions for oxycodone, WIECKOWSKI distributed oxycodone to them, and then completed the blank prescription forms to cover the dispensed amount of oxycodone.  WIECKOWSKI, at times, also included non-controlled substances in these

7

fraudulent prescriptions, to attempt to make the prescription look less suspicious.

16.   LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, took extensive measures to attempt to hide this illegal oxycodone distribution, and directed others to do so as well.  For example, at times, WIECKOWSKI would not verify oxycodone prescriptions that she knew to be fraudulent with the physicians who purportedly wrote the prescriptions.  Other times, WIECKOWSKI would call the alleged prescribing physician's office, but would disconnect the call before anyone could answer, thereby attempting to create a record of a call.

17.   In or about April 2014, after the DEA Audit, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, sold MW&W, but continued to operate the EUROPEAN APOTHECARY.  At EUROPEAN APOTHECARY, WIECKOWSKI continued to illegally dispense controlled substances, including oxycodone.

18.   In or about September 2015, a DEA undercover agent ("UC-1") was introduced to LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants. UC-1 was posing as an employee at a physician's office who was interested in having stolen and falsified prescriptions filled at a pharmacy.

19.   In or about September 2015 and October 2015, UC-1 arranged to and did purchase more than 700 30-milligram tablets

of oxycodone from LILIAN JAKACKI, a/k/a "Lilian Wieckowski" and

MARCIN JAKACKI, a/k/a "Martin," the defendants, using

illegitimate prescriptions.  During conversations to arrange the

purchases, JAKACKI referred to the tablets as "candies" and told

UC-1, in sum and substance, that he needed certain information

because JAKACKI wanted to verify that UC-1 was not a DEA agent.

At EUROPEAN APOTHECARY, UC-1 interacted personally with

WIECKOWSKI, who took the illegitimate prescriptions from UC-1

and filled them.  WIECKOWSKI even instructed UC-1 as to how to

complete a blank prescription form so that UC-1 could use it to

purchase oxycodone illegally.

### STATUTORY ALLEGATIONS

20.  From at least in or about March 2010, up to and

including in or about October 2015, in the Southern District of

New York and elsewhere, LILIAN JAKACKI, a/k/a "Lilian

Wieckowski," MARCIN JAKACKI, a/k/a "Martin," MW&W GLOBAL

ENTERPRISES, INC., d/b/a "Chopin Chemists," EUROPEAN APOTHECARY,

INC., d/b/a "Chopin Chemists," and ROBERT CYBULSKI, the

defendants, and others known and unknown, intentionally and

knowingly did combine, conspire, confederate and agree, together

and with each other, to violate the narcotics laws of the United

States.

21.  It was a part and an object of the conspiracy

that LILIAN JAKACKI, a/k/a "Lilian Wieckowski," MARCIN JAKACKI,

a/k/a "Martin," MW&W GLOBAL ENTERPRISES, INC., d/b/a "Chopin Chemists," EUROPEAN APOTHECARY, INC., d/b/a "Chopin Chemists," and ROBERT CYBULSKI, the defendants, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1).

22.   The controlled substance that LILIAN JAKACKI, a/k/a "Lilian Wieckowski," MARCIN JAKACKI, a/k/a "Martin," MW&W GLOBAL ENTERPRISES, INC., d/b/a "Chopin Chemists," EUROPEAN APOTHECARY, INC., d/b/a "Chopin Chemists," and ROBERT CYBULSKI, the defendants, conspired to distribute and possess with the intent to distribute was mixtures and substances containing a detectable amount of oxycodone, in violation of 21 U.S.C. § 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

COUNT TWO

(Conspiracy to Commit Health Care Fraud)

The Grand Jury further charges:

23.   The allegations set forth in paragraphs 1 through 22 are incorporated by reference as if set forth fully herein.

24.   Between at least in or about 2010 and in or about April 2014, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MW&W GLOBAL ENTERPRISES, INC., d/b/a "Chopin Chemists," the defendants, and others engaged in a conspiracy to fraudulently

10

obtain reimbursement for prescription medications from Medicare. Specifically, at MW&W, WIECKOWKSI obtained prescriptions for medications for which she billed Medicare, but which she did not actually dispense to customers. These customers were willing to forgo the prescribed medications, in exchange for a store credit at MW&W. Through this scheme, WIECKOWSKI claimed tens of thousands of dollars in reimbursements from Medicare, which were wired into a bank account she controlled.

### Background of the Medicare Program

25. The Medicare program is a federal health care program providing benefits to persons who are over the age of 65 or disabled. The Centers for Medicare and Medicaid ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"), is responsible for overseeing the Medicare program in New York State. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

26. Medicare provides coverage to its beneficiaries for prescription drugs. That prescription drug coverage is provided through Medicare Part D, which is administered by insurance companies that are reimbursed by Medicare through CMS.

27. When a beneficiary of Medicare seeks to obtain medication from a pharmacy, the pharmacy provides the medication to the beneficiary at a reduced cost or no cost to the

beneficiary.   The cost to the pharmacy is typically reimbursed
in whole or in part by the Medicare program.   Moreover, in the
normal course, pharmacies bill Medicare for prescription drugs
that the pharmacies have purchased from licensed wholesalers.

<u>WIECKOWSKI'S SCHEME TO DEFRAUD MEDICARE</u>

28.   Beginning at least in or about 2010, LILIAN
JAKACKI, a/k/a "Lilian Wieckowski," and MW&W GLOBAL ENTERPRISES
INC., d/b/a "Chopin Chemists," the defendants, conspired with
others to defraud Medicare out of hundreds of thousands of
dollars in reimbursements.   An audit conducted by HHS for the
period between in or about January 2010 and in or about April
2014 (the "HHS Audit"), analyzed the purchasing records and
Medicare prescription records for a number of medications that
accounted for a significant percentage of the reimbursements
MW&W received from Medicare.   The HHS Audit showed that during
this period, Medicare reimbursed for more than $700,000 worth of
claims for prescription medication that there was no record of
actually having been purchased by MW&W.   In other words,
WIECKOWSKI submitted reimbursement claims to Medicare amounting
to more than $700,000 worth of certain prescription medications
than records show as having been purchased by MW&W.

29.   The largest shortfall, more than $170,000 worth,
was related to an expensive prescription gel ("Medication-1").
With respect to Medication-1, WIECKOWSKI's scheme worked as

12

follows.  Customers came to MW&W with a prescription that called

for them to receive a specific number of tubes of Medication-1.

WIECKOWSKI then submitted a claim to the customer's insurance

company, at times Medicare, to be reimbursed for the number of

tubes set forth on the prescription.  The insurance company then

wired reimbursement funds for the specified number of tubes of

Medication-1 into WIECKOWSKI's business bank account.

30.  Although LILIAN JAKACKI, a/k/a "Lilian

Wieckowski," and MW&W GLOBAL ENTERPRISES, INC., d/b/a "Chopin

Chemists," the defendants, were reimbursed for the amount of

Medication-1 specified by the prescription, WIECKOWSKI did not

dispense that amount to the customer.  Instead, for example,

WIECKOWSKI provided the customer with only one tube of

Medication-1, and instead gave the customer a percentage of the

value of the undispensed medication as a store credit at MW&W.

31.  LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the

defendant, carried out this scheme with respect to other

medications in addition to Medication-1, resulting in at least

$750,000 in claims that were falsely submitted for

reimbursements to Medicare.

## STATUTORY ALLEGATIONS

32.  From at least in or about 2010, up to and

including in or about April 2014, in the Southern District of

New York and elsewhere, LILIAN JAKACKI, a/k/a "Lilian

Wieckowski" and MW&W GLOBAL ENTERPRISES, INC., d/b/a "Chopin Chemists," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit health care fraud, in violation of Title 18, United States Code, Section 1347, to wit, WIECKOWSKI and MW&W conspired to seek reimbursement from Medicare for prescription drugs that were never dispensed to customers.

33. It was a part and an object of the conspiracy that LILIAN JAKACKI, a/k/a "Lilian Wieckowski" and MW&W GLOBAL ENTERPRISES, INC., d/b/a "Chopin Chemists," the defendants, and others known and unknown, willfully and knowingly, executed and attempted to execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

14

COUNT THREE

**(Money Laundering Conspiracy)**

The Grand Jury further charges:

34.   The allegations set forth in paragraphs 1 through 33 are incorporated by reference as if set forth fully herein.

**The Money Laundering Scheme To Purchase the House**

35.   In or about 2012, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants, conspired with others to launder hundreds of thousands of dollars in cash proceeds derived from the illegal oxycodone distribution described in Count One of this Indictment.  Through a series of coordinated cash and check deposits, and wire transfers, WIECKOWKI and JAKACKI used hundreds of thousands of dollars obtained from their illegal conduct to purchase, among other things, a house valued at more than $2 million in Greenwich, Connecticut (the "Greenwich House").

36.   In or about 2012, WIECKOWSKI attempted to obtain a mortgage through a bank ("Bank-1").  Working with others, in or about 2012, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants, orchestrated a series of financial transactions designed to increase the cash balance into a bank account ("Account-1") using the cash proceeds derived from their illegal oxycodone distribution.

37.   Over a period of several months in or about 2012,
LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI,
a/k/a "Martin," the defendants arranged for nearly $450,000 in
cash and checks to be first deposited into bank accounts they
controlled, and then subsequently transferred again to Account-
1.   A number of these deposits were made by co-conspirators not
named herein.   WIECKOWSKI falsely represented to Bank-1 that
many of these deposits were, among other things, "wedding
gifts," "loan repayments," or "gifts from husband." In reality,
the majority of the funds being deposited, however, were the
proceeds from the illegal oxycodone distribution business the
defendants operated.

38.   Despite the increased cash balance in Account-1,
Bank-1 denied the mortgage application submitted by WIECKOWKSI
to purchase the Greenwich House.   Soon after Bank-1 denied the
mortgage application, WIECKOWSKI closed Account-1, and
transferred the funds contained in the Account-1 to escrow
accounts controlled by the attorneys negotiating the sale of the
Greenwich House (the "Escrow Accounts").   Before reaching the
Escrow Accounts, some of the funds were first routed through
other bank accounts held by WIECKOWSKI at other banks.   In
total, more than $1 million, a significant portion of which was
derived from illegal activity, was transferred to the Escrow

Accounts, and used ultimately as a down payment towards the purchase of the Greenwich House.

## STATUTORY ALLEGATIONS

39. From at least in or about May 2012, up to and including in or about December 2012, in the Southern District of New York and elsewhere, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other, to violate Title 18, United States Code, Sections 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), and 1957.

40. It was a part and an object of the conspiracy that LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, the depositing of funds into bank accounts, represented the proceeds of some form of unlawful activity, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, the proceeds of the narcotics trafficking offense described in Count One of this Indictment, knowing that the transactions were designed in whole and in part to avoid a transaction reporting

requirement under State and Federal Law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii).

41.   It was further a part and an object of the conspiracy that LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in a financial transaction, to wit, depositing cash into bank accounts, represented the proceeds of some form of unlawful activity, would and did conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity, to wit, the narcotics trafficking offense described in Count One of this Indictment, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

42.   It was further a part and an object of the conspiracy that LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI a/k/a "Martin," the defendants, and others known and unknown, within the United States, in an offense involving and affecting interstate and foreign commerce, knowingly would and did engage in a monetary transaction, to wit, the purchase of the Greenwich House, in criminally derived property of a

18

value greater than $10,000 that was derived from specified

unlawful activity, to wit, the narcotics trafficking offense

described in Count One of this Indictment, in violation of Title

18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

## Count Four

### (Money Laundering)

The Grand Jury further charges:

43.   The allegations set forth in paragraphs 1 through

42 are incorporated by reference as if set forth fully herein.

44.   As described above, LILIAN JAKACKI, a/k/a "Lilian

Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants,

engaged in or directed financial transactions involving hundreds

of thousands of dollars-worth of illegal proceeds from the

narcotics trafficking offense described in Count One of this

Indictment, in order to finance the purchase of the Greenwich

House.

### STATUTORY ALLEGATIONS

45.   From at least in or about May 2012, up to and

including in or about December 2012, in the Southern District of

New York and elsewhere, LILIAN JAKACKI, a/k/a "Lilian

Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants,

in an offense in and affecting interstate and foreign commerce,

knowing that the property involved in a financial transaction

19

represented the proceeds of some form of unlawful activity,
conducted and attempted to conduct such a financial transaction
which in fact involved the proceeds of specified unlawful
activity, to wit, the narcotics trafficking offense described in
Count One of this Indictment, knowing that the transaction was
designed in whole or in part to conceal or disguise the nature,
the location, the source, the ownership, and the control of the
proceeds of specified unlawful activity, to wit, the narcotics
trafficking offense described in Count One of this Indictment,
and knowing that the transaction was designed in whole and in
part to avoid a transaction reporting requirement under State
and Federal law, to wit, WIECKOWSKI and JAKACKI caused to be
deposited United States currency, in structured amounts each
under $10,000, that were the proceeds of the narcotics
trafficking described in Count One of this Indictment, into at
least one bank account in New York, New York.

(Title 18, United States Code, Sections 1956 and 2.)

### COUNT FIVE

### (Money Laundering)

The Grand Jury further charges:

46.   The allegations set forth in paragraphs 1 through
45 are incorporated by reference as if set forth fully herein.

47.   In addition to the laundering transactions
related to the purchase of the Greenwich House, LILIAN JAKACKI,

a/k/a "Lilian Wieckowski," the defendant, also used the illegal reimbursements she received from Medicare to finance the illegal oxycodone distribution conspiracy.

### The Money Laundering Scheme To Promote The Illegal Oxycodone Ring

48.   As set forth above, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, dispensed hundreds of thousands of tablets of oxycodone from MW&W, the majority of which were illegally distributed.   To fuel her illegal oxycodone distribution conspiracy, WIECKOWSKI ordered oxycodone at an unusually high volume.   As noted, for three years, between 2010 and 2012, WIECKOWKSI's Brooklyn Pharmacy was the highest purchaser of oxycodone in a zip code that included national pharmacies.

49.   At the same time, as described above, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, also defrauded Medicare out of hundreds of thousands of dollars. Between in or about January 2010 and April 2014, WIECKOWSKI received more than $700,000 in fraudulent reimbursements from Medicare.

50.   Between at least in or about January 2010 and in or about April 2014, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, also used the reimbursements she obtained by defrauding Medicare to, in part, fund her illegal oxycodone

distribution business.  As set forth above, during this period,
hundreds of thousands of dollars were paid to WIECKOWSKI by
Medicare based on her false reimbursements.  These Medicare
reimbursement funds were wired directly into a bank account
controlled by WIECKOWSKI.  WIECKOWSKI then used the funds in
this account to buy the oxycodone that was dispensed in her
Pharmacies, much of which she then sold illegally in exchange
for cash payments.

## STATUTORY ALLEGATIONS

51.  From at least in or about January 2010, up to and
including in or about April 2014, in the Southern District of
New York and elsewhere, LILIAN JAKACKI, a/k/a "Lilian
Wieckowski," the defendant, in an offense in and affecting
interstate and foreign commerce, knowing that the property
involved in a financial transaction represented the proceeds of
some form of unlawful activity, conducted and attempted to
conduct such a financial transaction which in fact involved the
proceeds of specified unlawful activity, to wit, the health care
fraud offense described in Count Two of this Indictment, with
the intent to promote the carrying on of specified unlawful
activity, to wit, WIECKOWSKI used the proceeds of the health
care fraud to purchase oxycodone, which she then distributed
illegally.

(Title 18, United States Code, Section 1956 and 2.)

22

COUNT SIX

(Conspiracy to Misbrand Prescription Drugs)

The Grand Jury further charges:

52. The allegations set forth in paragraphs 1 through 51 are incorporated by reference as if set forth fully herein.

53. Between at least in or about 2010 and in or about 2011, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, conspired with others to purchase prescription medications from a black market source at a deep discount from the prices legitimate suppliers typically charged, and then sell them in MW&W.

## Overview of the Misbranding Scheme

54. Starting at least in or about 2010, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, purchased popular prescription medications from a black market source. WIECKOWSKI often obtained these prescription medications at up to a 50% discount from the prices typically charged by legitimate suppliers. These sales were usually arranged through a co-conspirator not named herein, who was compensated by WIECKOWSKI.

55. For approximately one year, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, obtained numerous prescription medications, including popular blood pressure medications, from the black market source. The drugs were

23

packaged in the same type of prescription pill bottles typically used by wholesalers, and were usually delivered to WIECKOWSKI in a grocery bag.  WIECKOWSKI paid for the prescription medication in cash.

### STATUTORY ALLEGATIONS

56.  From at least in or about 2010, up to and including in or about 2011, in the Southern District of New York and elsewhere, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, and others known and unknown, willfully and knowingly combined, confederated, conspired, and agreed together and with each other to violate the laws of the United States.

57.  It was a part and an object of the conspiracy that LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, and others known and unknown, with the intent to defraud and mislead, would and did receive in interstate commerce and deliver and proffer for delivery for pay and otherwise misbranded drugs, as defined in 21 U.S.C. § 353(b)(1), in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).

### Overt Act

58.  In furtherance of said conspiracy and to effect the illegal object thereof, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, together with others known and unknown, committed the following act, among others, in the Southern District of New York and elsewhere:

24

a.  In or about 2010, two co-conspirators not named herein met in New York, New York, for the purpose of transferring the proceeds from the sale of misbranded prescription medication.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATIONS

(Narcotics Offense)

59.  As a result of committing the controlled substance offense alleged in Count One of this Indictment, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," MARTIN JAKACKI, a/k/a "Martin," MW&W GLOBAL ENTERPRISES, INC., d/b/a "Chopin Chemists," EUROPEAN APOTHECARY, INC., d/b/a "Chopin Chemists," and ROBERT CYBULSKI, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting and derived from any proceeds the defendants obtained directly or indirectly as a result of the offense and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the offense.  This property shall include, but not be limited to, all right, title and interest of the defendants in all that lot or parcel of land, together with its buildings, appurtances, improvements, fixtures, attachments and easements, located at 106 Porchuck Road, Greenwich, Connecticut 06831.

(Health Care Fraud Offense)

60.  As a result of committing the health care fraud offense alleged in Count Two of this Indictment, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MW&W GLOBAL ENTERPRISES, INC., d/b/a "Chopin Chemists," the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, any and all property constituting and derived from any proceeds the defendants obtained directly or indirectly as a result of the offense.  This property shall include, but not be limited to, all right, title and interest of the defendants in all that lot or parcel of land, together with its buildings, appurtances, improvements, fixtures, attachments and easements, located at 106 Porchuck Road, Greenwich, Connecticut 06831.

(Money Laundering Offenses)

61.  As a result of committing the offenses alleged in Counts Three, Four, and Five of this Indictment, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," and MARCIN JAKACKI, a/k/a "Martin," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offenses, or any property traceable to such property.  This property shall include, but not be limited to, all right, title and interest of the defendants in all that lot or parcel of land, together with its

26

buildings, appurtances, improvements, fixtures, attachments and easements, located at 106 Porchuck Road, Greenwich, Connecticut 06831.

(Misbranding Offense)

62.   As a result of committing the misbranding offense alleged in Count Six of this Indictment, LILIAN JAKACKI, a/k/a "Lilian Wieckowski," the defendant, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 334 and Title 28, United States Code, Section 2461, any article of food, drug, or cosmetic involved in the commission of said offense.

SUBSTITUTE ASSET PROVISION

63.   If any of the above described forfeitable property, as a result of any act or omission of the defendants:

(a)   cannot be located upon the exercise of due diligence;

(b)   has been transferred or sold to, or deposited with, a third person;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e) has been commingled with other property which
cannot be subdivided without difficulty; it is the intent of the
United States, pursuant to Title 18, United States Code, Section
982(b), and Title 21, United States Code, Section 853(p), to
seek forfeiture of any other property of said defendants up to
the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982, and 1956;
Title 21, United States Code, Sections 331, 334, 841, 846, and
853(p); and Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
United States Attorney

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

LILIAN JAKACKI, a/k/a "Lilian
Wieckowski,"
MARCIN JAKACKI, a/k/a "Martin,"
MW&W GLOBAL ENTERPRISES, INC., d/b/a
"Chopin Chemists,"
EUROPEAN APOTHECARY, INC., a/k/a "Chopin
Chemists," and
ROBERT CYBULSKI,

Defendants.

### SEALED INDICTMENT

15 Cr.

(18 U.S.C. §§ 371, 1349, and 1956,
and 21 U.S.C. §§ 846 and 853.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

10/26/15   Fld. Indictment under seal, A/w's issued.

Pitman, US MJ